UNPUBLISHED

COURT OF APPEALS OF VIRGINIA


Present: Judges Frank, Petty and Senior Judge Haley
Argued at Alexandria, Virginia


ATIA ELYASS

v.      Record No. 0667-13-4

FAIRFAX COUNTY DEPARTMENT
  OF FAMILY SERVICES                                    MEMORANDUM OPINION* BY
                                                        JUDGE JAMES W. HALEY, JR.
ATIA ELYASS                                             NOVEMBER 26, 2013

v.      Record No. 0684-13-4

FAIRFAX COUNTY DEPARTMENT
  OF FAMILY SERVICES


                   FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                              R. Terrence Ney, Judge

        Michael S. Arif (Arif & Associates, P.C., on brief), for appellant.

        May S. Kheder, Assistant County Attorney; Kathleen Rust Bell,
        Guardian *ad litem* for the minor child (David P. Bobzien, County
        Attorney; Peter D. Andreoli, Jr., Deputy County Attorney, on brief),
        for appellee.


        Atia Elyass (father) appeals an order terminating his parental rights to his child, A.E.  Father

argues that the trial court erred in terminating his parental rights because the Department of Family

Services (the Department) failed to prove by clear and convincing evidence, that (1) father was,

without good cause, unwilling or unable within a reasonable period of time, to remedy substantially

the conditions which led to or required continuation of the placement of the child in foster care;

---

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

(2) pursuant to Code § 16.1-283(C)(1), father had failed to maintain contact with the child or plan for the future of the child; (3) the termination of parental rights was in the best interests of the child; and (4)[1] the Department had provided father with sufficient and appropriate visitation with the child after the child was placed in foster care.[2] We find no error and affirm the decision of the trial court.

BACKGROUND

We view the evidence in the light most favorable to the prevailing party below and grant to it all reasonable inferences fairly deducible therefrom. See Logan v. Fairfax Cnty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).

A.E. is the child of father and Sania Mikhail (mother). A.E. was born in 2004. The Department initially became involved with the family in 2008 because of several reports alleging lack of supervision of A.E.

In March 2009, mother attempted suicide after fighting with father. Mother was hospitalized, and a safety plan was established with father as the primary caretaker for A.E. The family sought reunification services from the Department, which the Department attempted to facilitate. In May 2009, there was another incident regarding lack of supervision. Another safety plan was put into place with father having primary responsibility for A.E.; however, father was unable to follow through and left daily tasks, such as bathing, clothing, and feeding A.E., to mother.

---

[1] Labeled as Assignment of Error "III. A." in the opening brief.

[2] We will not consider the second assignment of error because the trial court terminated father's parental rights pursuant to Code § 16.1-283(C)(2), not Code § 16.1-283(C)(1). In addition, we will not consider the fourth assignment of error because the trial court did not rule that the Department provided appropriate, or inappropriate, visitation to the father. Accordingly, "there is no ruling for us to review on appeal." Ohree v. Commonwealth, 26 Va. App. 299, 308, 494 S.E.2d 484, 489 (1998). See Fisher v. Commonwealth, 16 Va. App. 447, 454, 431 S.E.2d 886, 890 (1993).

In early October 2010, mother called the Department and told the social worker that she was frustrated and could not care for the child. The Department also received reports that the child had been exposed to domestic violence and mother's mental instability. The home-based worker reported that there was no effective change in the household, despite the services, and the family was in a "continued state of crisis." On October 8, 2010, the Department removed the child from the parents' custody after it learned that the child, who was six years old at the time, left the home while mother and father were arguing. The child walked across a busy street to a grocery store parking lot at night. The Department filed a petition alleging that the child was abused and neglected.

Mother has bi-polar disorder, borderline personality disorder, and post-traumatic stress disorder. When the Department removed A.E. from the home, mother had not been compliant with her medication and mental health treatment.

On November 12, 2010, the Fairfax County Juvenile and Domestic Relations District Court (the JDR court) entered an order finding that the child was an abused and/or neglected child. The JDR court approved the foster care plan with the goal of A.E. returning home.

Father was ordered to undergo a psychological evaluation and a parent-child assessment and to follow any treatment recommendations.

In November 2010, Dr. Carolyn Corbett conducted a parent-child assessment on mother, father, and the child. Mother and father were argumentative during the parent-child assessment. They were unable to follow Dr. Corbett's lead with structure and setting limits for the child. Father would try to interact with the child, but mother would become agitated and yell at father. Father eventually withdrew. The child withdrew and played by himself while his parents were arguing. Dr. Corbett concluded, "Prognosis for improvement is severely guarded."

In November 2010, Dr. William Ling conducted a neuropsychological evaluation on mother and a psychological evaluation on father. Dr. Ling concluded that father had "mild to moderate deficiencies in his cognitive functioning." Dr. Ling explained that father's "ability to understand appropriately and fully the circumstances to be able to effectively problem-solve under those circumstances would be limited." Dr. Ling noted that although father stated that he was "firmly committed" to his marriage and parenting his child, father was living separate and apart from mother and had "very limited involvement with parenting their son." Dr. Ling concluded that father's limitations affected his ability to parent his child, and he was unable to provide for and supervise A.E.

Father attended and completed parenting classes. He also enrolled in a program called Fathers in Touch, which helps to build parenting skills for fathers while providing structured and supervised activities for fathers and their children. Father asked that A.E. be allowed to participate in some of the activities, but his request was denied.

In June 2011, mother and father started couples' therapy with Dr. Manal Abukishk. Mother could not control her anger and was verbally abusive toward father. Dr. Abukishk held five joint sessions before deciding to see mother and father individually. Father repeatedly arrived late to appointments and then had medical issues which prevented him from coming to appointments. Dr. Abukishk concluded that although father "can form a positive attachment," he also had "neuropsychological limitations." Dr. Abukishk further stated that father showed "ineffectiveness in autonomy and issues with executive functioning," which affected his ability to stay on top of daily tasks, such as housing and paying bills.

The parents were reevaluated by Dr. Corbett and Dr. Ling, who had different conclusions about father. Dr. Ling noted that father's performance was "degraded," and he gave more "superficial" responses than he previously did. Dr. Ling was surprised by some of father's

responses, especially since he had been to parenting classes since the last evaluation. Dr. Ling explained that on the day of the testing, father was "agitated," which may have impacted his performance. However, Dr. Ling concluded that father lacked the ability to parent the child. Dr. Ling determined that if father were to improve his functioning, it would be "very slowly or if at all."

Likewise, Dr. Corbett remained concerned about father's ability to parent A.E., despite father having received services. However, Dr. Corbett's evaluation of father was better than Dr. Ling's evaluation. Dr. Corbett stated that father "tested at a level that would be expected, given his education." Dr. Corbett noted that father had difficulty processing information quickly, which impacted his decision-making with respect to parenting.

The Department asked father to obtain suitable and appropriate housing. Father had been living in a house with several other people. Initially, father was cooperative in arranging background checks and fingerprints of his roommates, but the roommates changed and father did not cooperate in getting the new roommates' fingerprints and background checks.

The Department also talked with father about his contact with mother, and how the instability was harmful to the child. Father could not, or would not, follow the Department's recommendations. He contacted mother when he was not supposed to. He told her his address. He sought her assistance when he had medical issues, and she took care of him. The Department was concerned that although the parents said they were no longer together, they clearly were still spending significant time together.

On November 28, 2011, the JDR court held a permanency planning hearing and approved an interim plan with a goal of return home and a concurrent goal of adoption.

The Department subsequently filed a petition to terminate father's parental rights and filed a foster care plan with the goal of adoption. On September 4, 2012, the JDR court entered

an order terminating father's parental rights and approved the goal of adoption.[3] Father appealed to the circuit court.

There was evidence that the child was doing well in foster care. The child has become attached to the foster parents. Since November 2010, the child has been in therapy with Dr. Sharon Lucas. Dr. Lucas diagnosed the child with Attention Deficit Hyperactivity Disorder, Post-Traumatic Stress Disorder, anxiety not otherwise specified, and dysthymic disorder. Dr. Lucas opined that the child's prognosis was good, so long as the child could remain in the same environment with the foster parents.

The trial court heard evidence and argument on November 27 and 28, 2012 and January 2 and 16, 2013. Afterwards, the trial court terminated father's parental rights and approved the foster care plan with the goal of adoption. This appeal followed.

ANALYSIS

"Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Martin v. Pittsylvania Cnty. Dep't of Soc. Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986) (citations omitted). "Where the record contains credible evidence in support of the findings made by that court, we may not retry the facts or substitute our view of the facts for those of the trial court." Ferguson v. Stafford Cnty. Dep't of Soc. Servs., 14 Va. App. 333, 336, 417 S.E.2d 1, 2 (1992).

The trial court terminated father's parental rights pursuant to Code § 16.1-283(C)(2), which states that a court may terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or
> unable within a reasonable period of time not to exceed twelve

---

[3] The JDR court also terminated mother's parental rights, and mother appealed to the circuit court.

months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

The Department had to prove, with clear and convincing evidence, that termination was in the child's best interests and that father was unable to substantially remedy the situation within twelve months. Id. The clear and convincing evidence required for termination is

"that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal."

Martin, 3 Va. App. at 21, 348 S.E.2d at 16 (quoting Gifford v. Dennis, 230 Va. 193, 198 n.1, 335 S.E.2d 371, 373 n.1 (1985)).

Father argues that the Department failed to meet its burden and that the trial court erred in finding that he had been unable or unwilling, within a reasonable period of time, to remedy substantially the conditions which led to or required continuation of A.E. being in foster care. When A.E. entered foster care, the Department was concerned with domestic violence in the home, the parents' hostility toward one another, mother's anger, and mother's volatility. For approximately two years, the Department worked with the family. Initially, the goal was to return the child home; however, it became clear that the parents could not remedy their situation.

Father was unable to demonstrate his ability to safely and effectively parent A.E. In the March 2011 foster care plan, the Department reported, "His household composition is unknown at this time. He reports to be renting a room from a friend." In the October 2011 foster care plan, the Department similarly reported, "His household composition is unknown at this time. He reports to be renting a room in a house with one other occupant." Father could not

understand the child's needs and place the child's needs above his own. The counselors opined that father was limited in his cognitive abilities.

In addition, despite the fact that the parents had a history of domestic violence and could not participate in joint counseling, they continued to remain together. As stated above, mother continued to yell at and berate father.

The Department worked with father toward the goal of returning A.E. home with father. The Department established several parameters, including father limiting his contact with mother. The Department expressed concern about father's history of separating from mother for a period of time and then returning to her. Despite the Department telling father not to provide mother with his address, so that A.E. would feel safe, father gave his address to mother. In addition, father continually sought out mother to assist him. While A.E. was in foster care, father hurt his foot. Mother took care of father and prepared meals for him. Father relied on mother to drive him to his doctor appointments, therapy sessions, and visitations. The record shows that father's life is so intertwined with the mother's life, despite the repeated admonitions to him that those lives be separated in the interest of the child, that such a severance, such an unraveling, cannot be reasonably expected. Ultimately, the Department determined that father was unable to remain within the parameters established by the Department and that A.E. could not be returned home to father because of father's relationship with mother.

When considering termination of parental rights, "the paramount consideration of a trial court is the child's best interests." Logan, 13 Va. App. at 128, 409 S.E.2d at 463.

Although there was evidence that father loved his child, he did not act in the child's best interests. Shortly before the hearing, father still could not see how his choices might negatively impact the child. Mother learned that she was pregnant and wanted to tell A.E. The counselors told her that it could be "very disrupting" to the child and told her not to tell A.E. Despite the

admonition from the counselor not to tell the child about the pregnancy, mother told father to tell the child about the pregnancy. Father did, and the child became upset. The foster mother said that she had not seen the child that upset since the child first came to live with them over two years earlier. Father did not stop to think about how the news might impact the child, or whether he should ask the counselors whether, and how, the news should be shared.

When it issued its ruling, the trial court noted that the Department removed the child in 2010 in order to protect the child because "[t]he parents of this child were so unable to get along with each other and so neglectful of the child's best interests." The trial court concluded, "Neither of these individuals – neither the mother nor the father – each of whom, both of whom love this child, are able in the Court's opinion, by clear and convincing evidence, to parent either individually or even more dramatically together . . . ." As a result, the trial court held that it was in the best interests of the child that mother and father's parental rights be terminated.

Mother appealed the trial court's ruling to terminate her parental rights, and this Court summarily affirmed the trial court's decision. See Mikhail v. Fairfax Cnty. Dep't of Fam. Servs., No. 0215-13-4 (Va. Ct. App. July 23, 2013). Mother did not appeal this Court's ruling.

Father blamed mother for their situation, but he did nothing to improve his situation. The child had been in foster care for twenty-seven months when the trial court issued its ruling. The statute provides for a parent to remedy his situation within twelve months. See Code § 16.1-283(C)(2).

> The twelve-month time limit established by Code § 16.1-283(C)(2) was designed to prevent an indeterminate state of foster care "drift" and to encourage timeliness by the courts and social services in addressing the circumstances that resulted in the foster care placement. "This provision protects the family unit and attendant rights of both parents and child, while assuring resolution of the parent/child relationship without interminable delay." Lecky v. Reed, 20 Va. App. 306, 312, 456 S.E.2d 538, 540 (1995). The legislation established a reasonably presumptive time frame of twelve months for parents to receive rehabilitative services to

enable them to correct the conditions that led to foster care placement. "The statute clearly contemplates that efforts to resolve the 'conditions' relevant to termination are constrained by time." Id. If the parent fails to substantially remedy those conditions within twelve months the court may act to prevent the child from lingering in foster care.

L.G. v. Amherst Cty. Dep't of Soc. Servs., 41 Va. App. 51, 56-57, 581 S.E.2d 886, 889 (2003).

Despite having twenty-seven months, neither mother nor father had been able to remedy the situation that led to the child being placed in foster care. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Kaywood v. Halifax Cnty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990).

The trial court did not abuse its discretion in terminating father's parental rights. There was sufficient evidence to prove that father was unable to remedy the conditions which led to the child's placement in foster care and that termination of father's parental rights was in the child's best interests.

CONCLUSION

For the foregoing reasons, the trial court's ruling is affirmed.

Affirmed.